UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| LESLIE MADDALONE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:21 CV 364 RWS |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant.[1] | ) | |

## MEMORANDUM AND ORDER

Plaintiff Leslie Maddalone ("Maddalone") brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Commissioner's ("Commissioner") decision to deny her application for disability insurance benefits and supplemental security income benefits.  For the reasons explained below, I will affirm the decision.

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted, therefore, for Andrew Saul as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## PROCEDURAL HISTORY

Maddalone filed a Title II application for disability insurance benefits and a Title XVI application for supplemental security income on July 27, 2018.[2] The claims were denied and Maddalone filed a timely request for a hearing. The ALJ issued her decision on November 1, 2019, finding that Maddalone was not entitled to benefits. She appealed. The Appeals Council granted her request for review, vacated the decision (for reasons unrelated to the ALJ's analysis of Maddalone's mental health diagnoses), and remanded the case for further proceedings.

Maddalone appeared before the same ALJ for a second hearing. The ALJ issued another unfavorable decision on September 28, 2020. The Appeals Council denied Maddalone's request for review of this decision. Maddalone then filed this case seeking judicial review of the Commissioner's decision. She argues that the ALJ did not properly evaluate one medical opinion in the record and as a result, the

---

[2] This was not Maddalone's first application for benefits. She previously filed Title II and Title XVI applications in 2015. Those claims were denied in a written decision dated November 29, 2017. (Tr. 79-90.) The Appeals Council denied review. Maddalone then sought review in this Court. Judge Stephen Limbaugh Jr. affirmed the Commissioner's decision. See Maddalone v. Saul, 2020 WL 1493599 (E.D. Mo. Mar. 27, 2020).

In the most recent decision, the ALJ summarized the prior administrative history of this case. She noted that Maddalone previously "alleged disability beginning December 29, 2014. However, the earliest date her allegations can be considered [in this action] is November 30, 2017, because the prior decision has *res judicata* effect." (Tr. 10.) Despite this, the ALJ considered all of the evidence in the record, "including the medical evidence pertaining to the time period already adjudicated." (Tr. 11.)

mental residual functional capacity ("RFC") she formulated was not supported by substantial evidence.

## LEGAL STANDARD

To be eligible for disability insurance benefits under the Social Security Act, a plaintiff must prove that she is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner conducts a five-step analysis.  See 20 C.F.R. § 404.1520; Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If not, the disability analysis proceeds to the next step.  At this step, the Commissioner decides whether the claimant has a

"severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities.  If the claimant's impairment(s) is not severe, then she is not disabled and the analysis ends.  If the claimant has a severe impairment, the Commissioner then determines whether the impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  If the claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled.  If the impairment is not equivalent to a listed impairment, then the Commissioner proceeds to the fourth step to determine whether the claimant can perform her past relevant work.  If so, the claimant is not disabled.  If not, at the last step, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the national economy.  If not, the claimant is declared disabled and becomes entitled to disability benefits.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the claimant, even if it is uncorroborated by objective medical evidence.  Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984).  The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole.  See, e.g., Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990).  In considering a claimant's subjective complaints, the ALJ is required to consider whether her complaints are consistent

with the medical evidence.  See Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (listing factors such as the claimant's daily activities, the duration, frequency, and intensity of the pain, precipitating and aggravating factors, dosage, effectiveness and side effects of medication, and functional restrictions).[3]  When an ALJ gives good reasons for the findings, the court will usually defer to her findings.  Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007).  However, the ALJ retains the responsibility of developing a full and fair record in the non-adversarial administrative proceeding. Hildebrand v. Barnhart, 302 F.3d 836, 838 (8th Cir. 2002).

In reviewing an ALJ's denial of Social Security disability benefits, my role is limited to determining whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence on the record as a whole.  Pate-Fires, 564 F.3d at 942.  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, I must consider evidence that both supports and detracts from the

---

[3] This was once referred to as a credibility determination, but the agency has now eliminated use of the term "credibility" to clarify that subjective symptom evaluation is not an examination of an individual's character.  However, the analysis remains largely the same, so the Court's use of the term credibility refers to the ALJ's evaluation of whether a claimant's "statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and other evidence of record."  See SSR 16-3p, 2017 WL 5180304, at *8 (Oct. 25, 2017); 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3); Lawrence v. Saul, 970 F.3d 989, 995 n.6 (8th Cir. 2020) (noting that SSR 16-3p "largely changes terminology rather than the substantive analysis to be applied" when evaluating a claimant's subjective complaints).

Commissioner's decision.  Id.  If, after reviewing the entire record, it is possible to draw two inconsistent positions and the Commissioner has adopted one of those positions, I must affirm the Commissioner's decision.  Anderson v. Astrue, 696 F.3d 790, 793 (8th Cir. 2012).  I may not reverse the Commissioner's decision merely because substantial evidence could also support a contrary outcome.  McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010).

## ADMINISTRATIVE RECORD

With respect to the medical records and other evidence of record, I adopt Maddalone's recitation of facts set forth in her Statement of Uncontroverted Material Facts, to the extent that they do not directly conflict with the Commissioner's Statement of Uncontroverted Material Facts and are supported by the record. Specific facts will be discussed as needed to address the parties' arguments.

## HEARINGS BEFORE THE ALJ

Maddalone first appeared for a hearing before the ALJ on August 19, 2019. She was 36 years old.  She testified that she lives with her boyfriend and three children (ages thirteen, eleven, and two). (Tr. 60.)  Her boyfriend works outside the home.  (Tr. 60.)  Maddalone herself has not worked since she had a brain aneurysm in December 2014.  (Tr. 62.)  She previously worked as a cocktail waitress and a bartender.  (Tr. 62-63.)  She cannot do basic things to care for herself without assistance and relies on her boyfriend, teenage niece, friend, and older children to

6

help her care for her youngest child, do chores, and go grocery shopping.  (Tr. 60, 66.)  She can prepare simple meals but does not cook because she cannot follow recipes and has had incidents in the kitchen, including forgetting to turn the stove off.  (Tr. 61, 65-66.)  She gets nervous around crowds and usually does not go anywhere except doctors' appointments and parent-teacher conferences for her children.  (Tr. 67.)  She does not read because she has trouble concentrating and spends most of her days at home watching TV.  (Tr. 67-68.)  She has trouble getting along with people, lacks patience, gets easily irritated, and cannot focus on finishing tasks.  (Tr. 68-69.)  The medication she currently takes makes her drowsy and she takes naps when she gets headaches, which happens usually every day.  (Tr. 69.)

The ALJ also heard testimony from a vocational expert.  She testified that an individual of Maddalone's age, education, and work history, who can perform work at a light exertional level; can frequently handle, finger, and feel bilaterally; cannot be exposed to unprotected heights or hazardous machinery; is limited to simple, routine, repetitive tasks; can only occasionally interact with supervisors and coworkers; and cannot have contact with the general public could not perform Maddalone's past work.  (Tr. 72.)  However, the vocational expert testified that such an individual could perform other jobs, including mail clerk, photocopy machine operator, and garment sorter.  (Tr. 72.)  The ALJ then changed the hypothetical by adding an additional restriction of redirection to tasks once a day.  The vocational

7

expert opined that such an individual could not perform any work that exists in substantial numbers in the national economy.  (Tr. 73.)

Upon remand from the Appeals Council, Maddalone appeared before the same ALJ at a second hearing on August 20, 2020.  She testified briefly about her physical pain, but most of the hearing focused on her mental health issues.  Her testimony was similar to that offered in the previous hearing.  Her living situation had not changed.  (Tr. 42.)  She still needs assistance with childcare, does not drive, and relies on her boyfriend to manage the family's finances.  (Tr. 45-47.)  However, when the ALJ asked if she could do "very basic things to care for [herself]," she responded in the affirmative.  (Tr. 42.)  She has trouble with her memory, attention span, and getting things done on time.  (Tr. 45-46.)  By way of example, she explained that she cannot remember appointments and when bills are due and relies on her phone calendar to send her reminders.  (Tr. 46.)  She also uses her phone to order groceries.  (Tr. 47.)  She is disorganized, gets easily frustrated, and has trouble focusing even when watching movies with her children.  (Tr. 47-48.)  She still cannot read or do other hobbies.  (Tr. 50-51.)

## ALJ DECISION

The ALJ found that Maddalone met the insured status requirements of the Social Security Act through December 31, 2019 and had not engaged in substantial gainful activity since November 30, 2017, her alleged onset date of disability.  (Tr.

13.)   The ALJ then determined that while Maddalone suffers from status post cerebral aneurysm with migraine headaches, status post bilateral carpal tunnel syndrome release, fibromyalgia/chronic pain syndrome, neurocognitive disorder, depression, anxiety, and attention deficit hyperactivity disorder (ADHD), these impairments do not meet or medically equal the severity of one of or a combination of the listed impairments in 20 C.F.R. § 404.[4]  (Tr. 12-13.)  The ALJ considered whether Maddalone's mental impairments meet or equal Listing 11.04 (Vascular Insult to the Brain) and found that they did not satisfy either the "paragraph B" and "paragraph C" criteria of the listing.[5]  (Tr. 15-16.)

Based on her consideration of the record, the ALJ found that Maddalone had an RFC to perform light work with certain limitations.  She is limited to only frequently handling, fingering, and feeling bilaterally.  She must avoid unprotected heights and hazardous machinery.  She is limited to simple routine repetitive tasks, not at a production rate pace, with few changes in the work setting.  She can only

---

[4] Maddalone does not object to any of the ALJ's findings regarding her physical impairments.  Her appeal is limited to the ALJ's analysis of her mental impairments.

[5] To satisfy the "paragraph B" criteria, a claimant's mental impairments must cause at least two "marked" limitations or one "extreme" limitation in a broad area of mental functioning.  An "extreme" limitation is defined as "the inability to function independently, appropriately, or effectively, and on a sustained basis."  A "marked" limitation is defined as "a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis."  (Tr. 14.) The ALJ found that Maddalone had "moderate" limitations in all four broad areas of functioning: (1) understanding, remembering, or applying information, (2) interacting with others, (3) concentrating, persisting, or maintaining pace, and (4) adapting or managing oneself.  (Tr. 14-16.)  Additionally, the ALJ found that "the evidence fails to establish the presence of the 'paragraph C' criteria."  (Tr. 16.)

occasionally interact with supervisors and coworkers and should never be required to interact with the general public.  (Tr. 16.)  Based on Maddalone's RFC, the ALJ found that she could not perform her past relevant work as a bartender or waitress. (Tr. 24.)  However, the ALJ found that she could perform other jobs in the national economy, including mail clerk, photocopy machine operator, and garment sorter. (Tr. 25.)  Accordingly, the ALJ denied Maddalone's applications.

## ANALYSIS

I.   The ALJ did not err in her evaluation of the opinion evidence.

Under the new regulations for evaluation of medical evidence, which apply to applications filed after March 27, 2017, ALJs are no longer required to "give any specific evidentiary weight, including controlling weight, to any medical opinion(s)," including those from treating physicians. 20 C.F.R. § 404.1520c(a), 416.920c(a). Instead, ALJs are to consider all medical opinions equally and evaluate their persuasiveness according to several specific factors, the most important of which are supportability and consistency.    20 C.F.R.  §§ 404.1520c(b)(2), 416.920c(b)(2).  "Supportability" is determined by whether an opinion is supported by relevant objective medical evidence, and the source's explanation for the opinion, while "consistency" is measured by how consistent the opinion is with other medical opinions and prior administrative findings.  20 C.F.R. §§ 404.1520c(c)(1)-(2).  An ALJ need only discuss other factors if "two or more medical opinions…about the

same issue are both equally well-supported and consistent with the record but are not exactly the same."  20 C.F.R. §§ 404.1520c(b)(3); 416.920c(b)(3).

Maddalone argues that the ALJ improperly analyzed the opinion offered by Alison Burner, M.A., a psychologist who performed an initial consultative examination of Maddalone in June 2017 and conducted a follow-up assessment in July 2019.   Ms. Burner opined that Maddalone demonstrated "psychological symptomology which would negatively affect obtaining or maintaining employment at this time."  (Tr. 979.)  Ms. Burner reached her conclusions through discussion with Maddalone and through testing.  In 2017, she administered the Wechsler Adult Intelligence Scale IV ("WAIS IV") test; Maddalone received a low average Full Scale IQ (85).  (Tr. 974.)  Ms. Burner did not readminister the WAIS IV test in 2019. However, she administered the Wechsler Memory Scale IV ("WMS IV") test in both 2017 and 2019.  This test revealed that Maddalone's "memory quotients fall within the well below average range in all areas" and that "her memory functioning is outside normal limits and is not commensurate with her cognitive ability."  (Tr. 976-77.)  According to Ms. Burner, these results suggest "a DSM diagnosis of a memory deficit and a neurocognitive disorder with behavioral disturbance."   (Tr. 979.) Ultimately, Ms. Burner concluded that Maddalone had a marked impairment in her ability to understand, remember, or apply information; a moderate impairment in her ability to interact with others; a marked impairment in her ability to concentrate,

11

persist, and maintain pace; and a marked impairment in her ability to adapt and manage oneself.  (Tr. 979-80.)

The ALJ deemed Ms. Burner's opinion unpersuasive and described her findings as follows:

> The opinion of Allison [sic] Burner, M.A., is not consistent with the medical evidence of record and therefore, is not persuasive.  She initially examined the claimant in the period previously adjudicated, but updated her report based on a second examination.  The examiner diagnosed a neurocognitive disorder based on tests administered in her office.  She did not treat the claimant and did not see her on a regular basis.  However, neither the claimant's treating neurologist(s) nor psychiatrist, both of whom are physicians in specialties that would allow them to make the same diagnosis, diagnosed such a disorder.  The undersigned finds the diagnoses of the treating physicians more persuasive than that of the consulting psychologist.  While qualified to give an opinion, the opinion of a licensed professional counselor, even based on testing, is not as persuasive as that of the treating sources.  In addition, Ms. Burner appears to have relied heavily on the claimant's subjective statements, which are not consistent with other medical evidence of record.  She noted that the [sic] had difficulty explaining things, that was not present in either hearing.  The claimant said she could not work her phone at evaluation, but testified she orders groceries online and her boyfriend picks them up.  In any event, the claimant's auditory visual memory score was considered in limiting her to simple routine repetitive work.

(Tr. 23.)

In addition to the above analysis, the ALJ discussed Ms. Burner's evaluation in detail elsewhere in her written decision.  (Tr. 15-16, 21-22.)  Maddalone contends that this analysis is inadequate because the ALJ did not properly discuss how Ms.

Burner's opinion is inconsistent with the rest of the medical evidence and did not discuss the supportability of the opinion at all.

Maddalone argues that the ALJ's characterization of Ms. Burner's opinion as "not consistent with the medical evidence of record" is too conclusory and "does not provide for meaningful review."  However, the ALJ summarized, in great detail, evidence that supports her finding of inconsistencies between the limitations Ms. Burner assessed and the rest of the record.  For example, none of Maddalone's treating providers—including a primary care physician, a psychiatrist, and two neurologists—ever diagnosed her with a neurocognitive disorder, instead treating her for anxiety, depression, and ADD/ADHD.  Her primary care physician, psychiatrist, and a neurologist consistently observed normal mood and affect, good insight and judgment, unremarkable thought content, intact thought process, and clear and normal speech.  (Tr. 452, 460-61, 465, 470, 916, 918, 920, 922, 924, 997, 999, 1002, 1004, 1006, 1008, 1010, 1013, 1053-54, 1070-71, 1093, 1101, 1103.) Several times, her psychiatrist, Dr. Franco Sicuro, described her overall condition as "stable."  (Tr. 922, 997, 999, 1006.)  Although she told Ms. Burner that Adderall did not help her focus, Maddalone never expressed that complaint to any of her doctors. (Tr. 872.)  In fact, records indicate that she found Adderall helpful in improving her focus and concentration.  At her first two appointments with her primary care physician, Dr. Jessica Miller, in January and March 2018, Maddalone reported poor

focus, poor motivation, high anxiety, depression, memory issues, difficulty concentrating, and difficulty focusing. (Tr. 449, 454.) Dr. Miller assessed her with ADD and started her on Adderall. (Tr. 456.) At the next appointment on April 24, 2018, Maddalone reported that "she thinks that [the Adderall] is helping," that "she is staying more on task," is "more focused," "feels like she can better get her thoughts out," and that "her boyfriend has really realized a difference." (Tr. 457.) Dr. Miller increased her Adderall dosage and referred her to a psychiatrist. Maddalone again reported effectiveness of her Adderall in July 2018. (Tr. 462.) In December 2019—five months after Ms. Burner's assessment—Dr. Miller specifically noted that Maddalone's ADD was "well controlled" and her "focus is doing well on Adderall." (Tr. 1101, 1103.)

Maddalone points to records from one of her neurologists, Dr. Richard Callison, emphasizing a January 2017 appointment in which she reported short-term memory difficulty and he assessed impairment of concentration and memory. (Tr. 592-93.) This appointment predates the alleged onset date of November 30, 2017. In August 2019, Dr. Callison offered a medical source statement in which he assessed extreme work-related limitations and repeatedly expressed his opinion that Maddalone is "unable to work." (Tr. 982-85.) As the ALJ noted, the record indicates that Dr. Callison stopped treating Maddalone in August 2017 and "she was lost to follow up for two years" until July 2019, when she returned "requesting [a] disability

form to be filled out."[6]  (Tr. 22, 987.)  When she did return in 2019, Maddalone again reported short-term memory difficulty and the doctor assessed impairment of concentration and memory, with fluent speech, no aphasia, and an alert and cooperative demeanor.  (Tr. 987, 991.)  Dr. Callison's August 2019 assessment was therefore mostly based on treatment that occurred before the alleged onset date, and the ALJ did not err in deeming it unpersuasive and inconsistent with the record as a whole from the time period relevant to this claim.  (Tr. 22.)

State agency consultant Dr. Linda Skolnick offered the other medical opinion in the record relating to Maddalone's mental health.   Dr. Skolnick reviewed Maddalone's records in October 2018 and opined that Maddalone had a moderate limitation in her ability to understand, remember, or apply information; a moderate limitation in her ability to interact with others; a moderate limitation in her ability to concentrate, persist, or maintain pace; and a mild limitation in her ability to adapt or manage herself.  (Tr. 110-12.)  The ALJ found this opinion consistent with other evidence in the record and deemed it persuasive, "with the exception of finding [Maddalone] has moderate limitations in adaption and management."  (Tr. 23.)

---

[6] It does not appear that Maddalone sought treatment from any neurologist between August 2017 and July 2019, instead seeing her primary care physician and psychiatrist for generally conservative treatment.  This is a fact that the ALJ properly considered, and one that undercuts Maddalone's claims of debilitating neurological problems.  See Lawrence, 970 F.3d at 996 (ALJ's conclusions as to the severity of pain and limitations were consistent with the fact that claimant was prescribed generally conservative treatment).

Finally, Maddalone's own hearing testimony contradicts some of Ms. Burner's findings. Ms. Burner noted that she was "not successful in using [her phone]" during the evaluation and that she reported she could not engage in self-care. (Tr. 974, 979-80.) However, at the August 2020 hearing, Maddalone testified that she relied on her phone to order groceries online and remind her of upcoming appointments. (Tr. 46-47.) She also testified that she could do some basic activities to care for herself. (Tr. 42.) Additionally, during both of her hearings, Maddalone demonstrated comprehension of the proceedings and responded appropriately to the ALJ's questions. This behavior is consistent with notes from Maddalone's treating providers about her generally normal affect, speech, and thought process, and is a stark contrast to the behavior that Ms. Burner apparently witnessed during her evaluation. (Tr. 979-80.)

Maddalone also argues that the ALJ erred because she did not discuss the supportability of Ms. Burner's opinion. She believes that the ALJ did not consider the results of the diagnostic tests Ms. Burner administered and dismissed Ms. Burner's findings because they were based on Maddalone's own subjective assessments of her abilities. The ALJ did observe that Ms. Burner's opinion "appears to have relied heavily on [Maddalone's] subjective statements, which are not consistent with other medical evidence of record." (Tr. 23.) However, the ALJ also clearly acknowledged that Ms. Burner's opinion was partially based on testing,

16

specifically discussing the results of the WMS IV (noting that this assessment "only addresses recall, not comprehension" but explaining that nonetheless, Maddalone's "auditory visual memory score was considered in limiting her to simple routine repetitive work") and Maddalone's IQ score ("[her] IQ score in the low average range indicates she is capable of understanding simple instructions").  (Tr. 15, 23.) Far from ignoring these tests, the ALJ explicitly considered the results when evaluating Ms. Burner's opinion and fashioning Maddalone's RFC, and reasonably concluded that they did not support the extreme functional restrictions Ms. Burner ultimately assessed.

Additionally, while the new Social Security regulations have eliminated the Treating Physician Rule, which accorded greater weight to opinions rendered by a claimant's treating provider, the regulations still instruct ALJs evaluating the persuasiveness of a medical opinion to consider the nature of the claimant's relationship with the opinion's source.   See 20 C.F.R. §§ 404.1520c(c)(3), 416.920c(c)(3) (factors for consideration include the length of the treatment relationship, frequency of examinations, purpose and extent of the treatment relationship, and whether the source actually examined the claimant or merely reviewed her records).  It was therefore appropriate for the ALJ to consider the fact that Ms. Burner did not treat Maddalone on a regular basis, and to compare her

findings with those of physicians who *did* treat her regularly and notably, did not diagnose a neurocognitive disorder.

Maddalone has certainly experienced the symptoms she described in her hearing testimony.  She reported difficulty concentrating, anxiety, poor attention span, and poor memory at various doctors' appointments, and sought treatment for these issues.  (Tr. 916, 918, 924, 1006, 1008, 1010, 1013).  However, none of her providers noted memory, concentration, or communication issues as serious or debilitating as those described by Ms. Burner.  Additionally, the record demonstrates that Maddalone has found some of her prescriptions helpful in managing her symptoms.  The record contains some evidence, discussed above, that supports the ALJ's ultimate characterization of Ms. Burner's opinion as unpersuasive.  As a result, I find that the ALJ did not err in her analysis of Ms. Burner's opinion.

II.    The RFC is supported by some medical evidence.

Maddalone also argues that the mental RFC the ALJ formulated is not supported by substantial evidence.  The Social Security regulations expressly state that the ALJ is "responsible for assessing residual functional capacity."  20 C.F.R. § 404.1546(c), 416.946(c).  See also Winn v. Comm'r, Soc. Sec. Admin., 894 F.3d 982, 987 (8th Cir. 2018).  In making this determination, the ALJ must consider "all the relevant evidence in [the claimant's] case record."  20 C.F.R. § 404.1545(a)(1).  While the ALJ has a duty to fully and fairly develop the record, she is not required

to obtain additional medical evidence if the evidence of record provides a sufficient basis for her decision. Martise v. Astrue, 641 F.3d 909, 926-27 (8th Cir. 2011).

The ALJ's written decision demonstrates that she carefully considered all of the evidence in the record, discussed in detail above, and that the RFC she fashioned is supported by some medical evidence. She accounted for Maddalone's difficulties understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing herself by imposing restrictions limiting her to simple, routine tasks not done at a production rate pace; occasional interaction with supervisors and coworkers; and no interaction with the general public. (Tr. 16.) These limitations are consistent with the evidence in the record. It is ultimately the claimant's burden to establish her RFC, and Maddalone failed to carry this burden by producing evidence that her RFC should be more limited. Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016).

Although Maddalone believes that the ALJ should have evaluated the medical evidence differently to support greater limitations, it is not my role to reweigh the evidence considered by the ALJ in her determination of a claimant's RFC. Id. at 934. Here, the ALJ did not substantially err when she concluded, based on the evidence in the record, that Maddalone had the RFC to perform light work with certain limitations.

19

The ALJ adequately explained her reasons for the weight given to the medical evidence of record in a manner consistent with the regulations. Substantial evidence in the record as a whole supports the ALJ's RFC determination, so I will affirm the decision of the Commissioner as within a "reasonable zone of choice."  Fentress v. Berryhill, 854 F.3d 1016, 1021 (8th Cir. 2017) (citing Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008)).

Accordingly,

**IT IS HEREBY ORDERED that** the decision of the Commissioner is affirmed, and Leslie Maddalone's complaint is dismissed with prejudice.

A separate Judgment is entered herewith.


_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 28th day of July, 2022.